**Lonell ANDERSON, Jr., Plaintiff,**

v.

**S.U.N.Y. HEALTH SCIENCE CENTER AT SYRACUSE, Defendant.**

Nos. 91–CV–1357, 92–CV–1501.

United States District Court, N.D. New York.

July 12, 1993.

---

Lonell Anderson, Jr., pro se.

N.Y.S. Atty. Gen. by Deirdre Roney, Asst. Atty. Gen., Albany, NY, for defendant.

## MEMORANDUM—DECISION AND ORDER

McAVOY, Chief Judge.

Representing himself *pro se,* plaintiff has brought a number of claims of unlawful discrimination against his former employer, the

State University of New York Health Science Center—Syracuse. After a trial on the various claims, and after determining that the Civil Rights Act of 1991 did not apply retroactively, the court addresses in this Memorandum–Decision and Order plaintiff's claims brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

## I. BACKGROUND

Plaintiff's complaint asserted numerous claims arising under 42 U.S.C. §§ 1981 and 2000e *et seq.* and 29 U.S.C. § 621 *et seq.* These claims sounded in discrimination based on age, race, sex, and his status as a Vietnam veteran. The claims arising from his status as a Vietnam veteran and his age were dismissed at the time of trial and proof was heard only on the Section 1981 and Title VII race/sexual harassment claims. The matter was tried in Watertown, New York commencing February 10, 1992 and liability and damages were bifurcated.

The matter was submitted to the jury on the Section 1981 claims under two theories. The first theory was that plaintiff was discharged from his position as assistant affirmative action coordinator by the defendant because of his race. The second was that plaintiff was fired from his position in retaliation for having submitted claims of racial discrimination by defendant's employees. The jury found that both of these claims were without merit and judgment was entered for the defendant thereon.

The Title VII claims were tried to the bench simultaneously with the Section 1981 case. The plaintiff proceeded on the Title VII claim on a number of distinct theories. The first was a "quid pro quo" sexual harassment theory by which he alleged that his immediate supervisor, Althea DeGraft–Johnson, took specific disciplinary action against him because he refused her sexual advances.

The second was a "hostile work environment" sexual harassment theory by which the plaintiff contended that an atmosphere of sexual harassment, perpetuated by DeGraft–

Johnson and others, permeated his working environment.

The third was a discriminatory discharge theory under which he alleges that he was discharged because of his race and gender.

The fourth was a retaliatory discharge theory, alleging that he was retaliated against for filing an earlier sexual harassment claim against the defendant with the New York State Division of Human Rights ("NYSDHR"). *See* 42 U.S.C. § 2000e–3(a).[1]

The following constitutes the court's findings of fact and conclusions of law with respect to the Title VII claims. *See* Fed. R.Civ.P. 52(a).

## II. FINDINGS OF FACT

With regard to the Title VII claims, the following facts were developed at trial. Prior to commencing his employment with defendant, plaintiff received a doctorate degree in education and administration from Knoxville College in Knoxville, TN. He asserted that while pursuing his graduate career he was involved in a love affair with Althea DeGraft–Johnson, a woman who thereafter became his supervisor at the defendant S.U.N.Y. Health Science Center ("defendant" or "Center") in 1988.

Ms. DeGraft–Johnson testified that she believed, prior to hiring the plaintiff as an Assistant Affirmative Action Officer with the defendant Center, that Mr. Anderson was well-qualified for such a position. Based upon this belief, she contacted him regarding employment while serving in her capacity as Interim Affirmative Action Officer for defendant. Plaintiff was eventually hired with the approval of the president of defendant Center on September 9, 1988. His claims of sex discrimination are founded on his belief that Ms. DeGraft–Johnson wanted to resume the affair they had enjoyed in graduate school and that he refused. Therefore, he asserted that Ms. DeGraft–Johnson, in retaliation for his refusing her advances, "wrote him up" several times for tardiness and incomplete assignments.

---

**1.** "The object of this section is obviously to forbid an employer from retaliating against an employee because of the latter's opposition to an unlaw-

ful employment practice." *Manoharan v. Columbia Univ. College of Physicians & Surgeons,* 842 F.2d 590, 593 (2d Cir.1988).

The evidence at trial revealed that in the spring of 1989, relations between DeGraft–Johnson and plaintiff deteriorated to the point that plaintiff threatened to resign. When Director of Personnel Mary Oliker learned of the situation which she viewed as a personality conflict, she went to the center's president, Dr. John Henry, and together they decided to remove DeGraft–Johnson from any supervisory role over plaintiff. De-Graft–Johnson, like plaintiff, was a black person. It was decided that Oliker would assume the role of Interim Affirmative Action Officer and directly supervise plaintiff, which she did for a number of months until she was replaced by one James Pendergast. Oliker and Pendergast both testified that plaintiff was often late in completing assignments and that sometimes others had to do the work assigned to plaintiff. Both indicated that he was unable to perform the duties for which he had been hired. This testimony was also supported by the testimony of DeGraft–Johnson who opined that while she believed plaintiff was capable of doing the job when she hired him, she later learned that he could not perform the tasks assigned to him. Both interim supervisors, Pendergast and Oliker, were ultimately replaced by a black man, Floyd Brown, who currently holds the job. Brown learned of plaintiff's inability to perform his tasks and ultimately terminated him on January 13, 1990. Brown also stated unequivocally that plaintiff was incapable of performing the duties of the position.

On cross-examination of defendant's witnesses, plaintiff was able to establish that he had prepared and written, at least in part, some of the EO6 forms that were required of such institutions by the state and federal governments and also that he had substantial statistical input into the affirmative action plan which the defendant formulated. However, in spite of these accomplishments no evidence was adduced that would support plaintiff's contention that he was treated disparately because of his race or his sex or that sexually harassing conduct occurred in the work place.

Plaintiff, acting pro se, said in his opening statement that he was discriminated against because of his race and sex, but he failed to take the witness stand although repeatedly advised by the court that failure to testify could result in adverse inferences. *See Gray v. Great American Recreation Ass'n.*, 970 F.2d 1081, 1082 (2d Cir.1992). Consequently, there was absolutely no evidence introduced that he was treated differently than any other employee because of his sex or race or that sexually harassing conduct, isolated or otherwise, occurred. The closest plaintiff came to establishing anything of the like was the fact that he had been reprimanded on three occasions by DeGraft–Johnson for being late and that his tardiness was memorialized in a document and placed in his personnel file. At or about the same period, a female secretary who had been employed in the affirmative action office also was reprimanded verbally for being tardy on several occasions but that information was not memorialized in writing and apparently never found its way into her personnel file. However, that person did not testify as a witness, nor did any of the witnesses who did testify say anything that would allow a fact finder to believe that the way the reprimands were handled were because of sex or race.

Plaintiff also tried to establish through cross-examination of the various witnesses that the negative reports he received from his superiors and the complaints that were made about him were because he had filed claims of racial discrimination against the defendant's employees. There was absolutely no proof that any of the evaluations given or complaints made about plaintiff had anything to do with the fact that he was a black man or that the evaluations were retaliatory in nature. As noted above, his supervisor, DeGraft–Johnson, was a black woman and the gentleman who ultimately discharged him for failure to perform appropriately, Floyd Brown, was a black man. Sex nor race played a role in the discharge of plaintiff. Further, without testimony by the plaintiff, there existed no proof of sexually harassing conduct. Finally, there was no evidence adduced tending to show that plaintiff's discharge was related in any manner to his previously filed NYSDHR complaint.

## III. CONCLUSIONS OF LAW

### A. *Quid–Pro–Quo* Sexual Harassment

■ "Under a 'quid pro quo' theory, the plaintiff employee must establish that [he] was denied an economic benefit either because of gender or because a sexual advance was made by a supervisor and rejected by [him]." *Kotcher v. Rosa and Sullivan Appliance Center, Inc.,* 957 F.2d 59, 62 (2d Cir. 1992). "The gravamen of a quid pro quo claim is that a tangible job benefit or privilege is conditioned on an employee's submission to sexual blackmail and that adverse consequences follow from the employee's refusal." *Carrero v. New York City Housing Authority,* 890 F.2d 569, 579 (2d Cir.1989). In circumstances which affect the economic status of the employee, the supervisor is deemed to have acted on behalf of the employer and the employer can be held liable even without a showing of direct knowledge of the alleged action. *Id.*

In the instant case, there is no proof in the record to convince this court that such "advances" occurred or that the negative evaluations placed in plaintiff's employment file by Ms DeGraft–Johnson were motivated by plaintiff's rejection of these advances. Nonetheless, even assuming *arguendo* that the advances occurred and that plaintiff received negative evaluations because of his rejection thereof, the evidence shows that his economic status was not altered as a result. Plaintiff was not demoted, passed over for promotion, suspended, laid-off, or discharged as a direct result of Ms. DeGraft–Johnson's evaluations. Rather, the facts revealed that plaintiff was discharged long after Ms. DeGraft–Johnson served as plaintiff's supervisor and that the discharge was based upon the independent evaluations of a number of successive supervisors after Ms. DeGraft–Johnson. The argument that the negative evaluations by De-Graft–Johnson had some causal connection to his eventual discharge is strained at best and has not been proven by a preponderance of the evidence. Plaintiff's claim on this theory must fail.

### B. Hostile Work Environment Sexual Harassment

"In contrast [to a quid pro quo theory], a 'hostile work environment' theory requires that the plaintiff prove not only actionable sex discrimination, but also that the supervisor's actions should be imputed to the employer." *Kotcher v. Rosa and Sullivan Appliance Center, Inc.,* 957 F.2d 59, 62 (2d Cir.1992). These two elements of (1) actionable sex discrimination, and (2) respondeat superior liability are addressed separately below.

■ In order to show actionable sex discrimination, "the plaintiff must first prove that discriminatory harassment occurred with respect to 'terms, conditions, or privileges' of employment, 42 U.S.C. § 2000e–2(a)(1), though [the plaintiff] need not show that [he] lost any tangible job benefits as a result thereof." *Id.* Further, "[a]ctionable sexual harassment must consist of more than isolated incidents or casual comments that express harassment or hostility." *Babcock v. Frank,* 783 F.Supp. 800, 808 (S.D.N.Y.1992). Rather, "[t]he harassment at issue must be 'sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment.'" *Kotcher,* 957 F.2d at 63 (quoting *Meritor Savings Bank FSB v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986)). In this regard, "the incidents must be repeated and continuous; isolated acts or occasional episodes will not merit relief." *Kotcher,* 957 F.2d at 63 (citing *Carrero v. New York City Housing Authority,* 890 F.2d 569, 577 (2d Cir.1989)). Whether such conduct reaches the level of actionable sexual harassment is determined by a totality of the circumstances under a reasonable person standard. *Babcock,* 783 F.Supp. at 808 (citing *Meritor,* 477 U.S. at 69, 106 S.Ct. at 2406–07).

■ To show that the supervisor's actions should be imputed to the employer, the "plaintiff must prove that the employer either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it." *Kotcher,* 957 F.2d at 63.

■ Here, plaintiff has failed to meet his burden on both elements. As above stated, there is little evidence, if any, upon which to conclude that sexual harassment, *of any lev-*

*el,* occurred. Even when assuming for purposes of discussion that DeGraft–Johnson did make unwanted sexual advances to the plaintiff, it can hardly be said that, within the totality of the circumstances, such actions were pervasive and continuous. Rather, when giving the plaintiff every benefit of doubt, a favor the court need not extend at this juncture, the evidence reveals, at most, isolated instances of such conduct. Further, even if it is assumed that the conduct occurred and that it was pervasive, the action cannot be imputed to the employer. The record clearly shows that when the plaintiff complained of DeGraft–Johnson's actions, the employer took immediate steps to *remove Ms. DeGraft–Johnson* from her supervisory capacity over plaintiff. Thus, even if it is assumed that harassment of the plaintiff occurred at one point, the employer provided adequate avenues for complaint *and* took immediate action upon learning of plaintiff's contentions. Consequently, the court finds that plaintiff has failed to meet his burden of proof on this claim and therefore it must be dismissed.

## C. Race/Gender Discrimination

■ Until recently, the standard for a Title VII discriminatory discharge claim had been well known and long standing. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1834–25, 36 L.Ed.2d 668 (1973); *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). Under this *"McDonnell Douglas/Burdine"* standard, a Title VII plaintiff bore the initial burden of proving by a preponderance of the evidence a prima facie case of discrimination.[2] *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824. If the plaintiff succeeded in so proving, the burden then shifted to the defendant to articulate some legitimate, non-discriminatory reason for the employment decision at issue. *Id.* If the defendant carried this burden by articu-

lating a non-discriminatory reason for the employment decision, the plaintiff then was required to prove by a preponderance of the evidence that the employer's professed non-discriminatory reason was but a pre-text for discrimination. *Id.* at 804, 93 S.Ct. at 1825. The plaintiff could do this "directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095; *see McDonnell Douglas,* 411 U.S. at 804–05, 93 S.Ct. at 1825.

■ This standard was slightly altered, however, in the recent case of *St. Mary's Honor Center v. Hicks,* —— U.S. ——, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Under *Hicks,* the Supreme Court's latest pronouncement in the area of employment discrimination, the first two steps of the test remain essentially the same. *Hicks, supra* at —— –——, 113 S.Ct. at 2747. The plaintiff must prove a prima facie case and the defendant then has the burden to produce a non-discriminatory reason for the discharge. *Id.* Should the defendant meet this burden, the plaintiff is then in the position to prove by a preponderance of the evidence that " 'the defendant intentionally discriminated against [him]' because of his race" or gender. *Id.,* at ——, 113 S.Ct. at 2745. While "the fact finder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination" *id.,* —— –——, 113 S.Ct. at 2749, simply disproving the defendant's non-discriminatory explanation, in and of itself, is no longer sufficient to establish a claim of unlawful discrimination. *See generally Hicks, supra.*

■ Despite many of the arguments which will arise out the interpretations of the *Hicks* standard, the court need not address

---

**2.** To prove a prima facie case for racial discrimination with regard to his race/gender claim, the plaintiff must show: (1) that he is a member of a protected class; (2) that he has satisfactorily performed the duties required by the position; (3) that he was discharged under circumstances suggesting that race or gender was a factor; and (4) that the employer hired or sought other applicants for the position. *See Song v. Ives Laboratories, Inc.,* 957 F.2d 1041, 1045 (2d Cir.1992) (discussing discrimination based on national origin).

such intricacies at this time nor must it delve into the issue of whether the new or the old standard properly applies to plaintiff's case. This is because under either standard, plaintiff has failed to establish a prima facie case on his claims and, even if he has, he has failed to rebut or disprove the defendants non-discriminatory reason for discharge. Indeed, plaintiff has offered little proof of the existence of unlawful discrimination other than the allegations contained in the complaint. The proof at trial showed, almost without contradiction, that plaintiff was discharged because he could not adequately perform the functions and duties of his position. While the plaintiff attempted to show otherwise, there was little to indicate that such a specifically articulated reason for his discharge was a pre-text for discrimination. On this claim as on the ones above, plaintiff has failed to carry his burden of proof.

### D. Retaliatory Discharge

■ Where, as in the case at bar, plaintiff alleges that his termination was motivated by the employer's retaliation for protected Title VII activity, the shifting burden is essentially the same as in the discriminatory discharge context, although the prima facie case contains somewhat different elements. *Cosgrove v. Sears Roebuck & Co.*, 1992 WL 8718 (S.D.N.Y.1992). "To make out a prima facie case of retaliation, a plaintiff must show participation in protected activity known to the defendant, an employment action disadvantaging the person engaged in the protected activity, and a causal connection between the protected activity and the adverse employment action." *Johnson v. Palma*, 931 F.2d 203, 207 (2d Cir.1991); *See also, Sumner v. United States Postal Service*, 899 F.2d 203, 208–09 (2d Cir.1990).

■ To establish that activity is protected under Title VII, a plaintiff need not prove the merit of the underlying discrimination complaint, but only that plaintiff "was acting under a good faith, reasonable belief that a violation existed." *Sumner*, 899 F.2d at 209. Here, there is no doubt that plaintiff's complaint to the NYSDHR was protected activity and that the employer knew of such action. Further, there can be little doubt that the eventual employment decision made by the employer, namely, the discharge of the plaintiff, was disadvantaging to the plaintiff. However, there is little evidence, if any, that there existed a causal connection between the protected activity and the eventual discharge.

While the law holds that the causal connection between the protected activity and the adverse employment action may be proved in various ways,[3] plaintiff has failed to show any connection between the two events other than the bald assertions made in the complaint. On the contrary, the overwhelming weight of the evidence showed that the plaintiff's discharge had no connection to the earlier filed NYSDHR complaint but rather that it was based on plaintiff's poor work performance.[4]

■ Even assuming (once again) for purposes of argument that plaintiff has established a prima facie case of discriminatory retaliation, the defendant has articulated a precise, non-discriminatory reason for the discharge which remained unrebutted by the plaintiff.[5] While the Second Circuit has said that "Title VII is violated if a retaliatory motive played a part in the adverse employment actions even if it was not the sole cause, and if the employer was motivated by retalia-

3. "The causal connection between the protected activity and the adverse employment action can be established indirectly with circumstantial evidence, for example, by showing that the protected activity was followed by discriminatory treatment or through evidence of disparate treatment of employees who engaged in similar conduct or directly through evidence of retaliatory animus." *Sumner*, 899 F.2d at 209.

4. "The critical question is whether a plaintiff has proven by a preponderance of the evidence that the defendant intentionally retaliated against the

plaintiff for engaging in protected activity." *Sumner*, 899 F.2d at 209 (citing and quoting *Wrighten v. Metropolitan Hospitals, Inc.*, 726 F.2d 1346, 1354 (9th Cir.1984)).

5. Once a plaintiff makes a prima facie case of retaliation, the familiar burden falls upon the employer to articulate a legitimate, nondiscriminatory reason for its actions. Should it do so, plaintiff must then show that the reasons advanced were pretextual. *Johnson v. Palma*, 931 F.2d at 207 (citing cases).

tory animus, Title VII is violated even if there were objectively valid grounds for the discharge," *Sumner* 899 F.2d at 209 (citations omitted), the evidence has shown that retaliatory animus played no role in the discharge.

Consequently, the court must find that plaintiff has failed to establish a prima facie case of discriminatory retaliation and has failed to rebut the defendant's non-discriminatory basis for discharge. Therefore the retaliation claim must be dismissed.

## IV. CONCLUSION

The court concludes that plaintiff has failed totally to make out a prima facie case with respect to any of his Title VII claims. Plaintiff has certainly established that he is in a protected class and demonstrated that at least at the time he was hired his qualifications matched those required by the defendant employer. However, the proof was uniform that his performance during the course of his employment with the defendant was sub-par and inadequate. Additionally, it was abundantly clear that the reasons defendant's employees gave for firing him were for legitimate non-discriminatory reasons. Plaintiff failed entirely to submit any proof that the reasons articulated by defendant's employees were pre-textual in nature and for these reasons plaintiff's Title VII claim is dismissed. Therefore, it is hereby **OR-DERED** that the Clerk of the Court is to enter judgment in favor of the defendant on all remaining claims and to close both files.

**IT IS SO ORDERED.**